**McALLISTER LIGHTERAGE LINE, Libelant,**

v.

**THE PEJEPSCOT, Respondent.**

**JOHN FREDERICK BARGE CORP., Libelant,**

v.

**THE CATHERINE McALLISTER, McAllister Lighterage Line, Cross-Respondent.**

**Nos. 19202, 19305.**

United States District Court
E. D. New York.

June 10, 1955.

Purdy, Lamb & Catoggio, New York City, Vincent A. Catoggio, New York City, of counsel, for McAllister Line.

Macklin, Peer, Hanan & McKernan, New York City, Leo F. Hanan, New York City, of counsel, for Pejepscot.

RAYFIEL, District Judge.

On February 22, 1949, at about 6:40 P.M., a collision took place in Newark Bay, about 1,800 feet north of the Central Railroad of New Jersey Bridge, between two tugboats, the Catherine McAllister and the Pejepscot. Both vessels were damaged, and each filed a libel against the other. The suits were tried together.

The facts are these: Prior to the accident the Catherine McAllister was proceeding south on Newark Bay, with an oil barge, the Tuscarora, in tow on her port side. The barge was 207 feet long, 43 feet wide, and was light. The tug showed red and green side lights, a white masthead light, and two staff lights on her after-mast, about 30 feet above the deck, indicating that she had a tow alongside. The barge showed two lights, one on each outside corner. When the Catherine McAllister was some distance from the said bridge, which spans the Bay, she sounded the three-whistle signal prescribed for calling on the bridge-tender to open the draw, since she could not pass under the bridge, which, unopened, has a clearance of only 35 feet at mean high water. The tide was at ebb, which means that it was going in the same direction as the Catherine McAllister. It was raining, and the wind was blowing out of the southeast at 25 miles an hour. While she waited for the draw to open she headed toward the easterly side of the channel, and, since she was obliged to wait for about ten minutes for the draw to open, she lay crosswise on the east side of the channel, her engines going forward, and then reversing, so that she could hold her position. The channel at that point is approximately 500 feet wide.

At about the same time, the tug Pejepscot, without a tow, and showing the proper lights, was proceeding north on Newark Bay and approaching the bridge. She sounded a three-whistle signal, indicating her desire to have the draw opened. Almost immediately thereafter the west draw of the bridge opened, and she came through at her full speed, which was about 8 miles an hour.

As the Pejepscot came through the draw, her captain saw the Catherine McAllister on his starboard bow, lying across the east side of the channel. He also observed another tug, which he later learned was the John Murray, with a barge in tow, north of the Catherine McAllister on the Pejepscot's port bow, and southbound, and, astern thereof, a small oil tanker, likewise on her port bow, and also southbound.

The captain of the Pejepscot testified that after passing through the draw he put his wheel to the right to get to the channel, and then proceeded up the west side thereof on a course which would take him between the Catherine McAllister and the other southbound vessels. He proceeded on this course, until he reached a point a very short distance astern of the Catherine McAllister. Almost immediately thereafter the collision took place between the starboard side aft of the Pejepscot and the stern of the Catherine McAllister.

The witnesses called in behalf of the Catherine McAllister testified that they saw the Pejepscot approach her at full

speed on a course which was sure to lead to a collision, while their vessel lay practically motionless in the water. Following are some excerpts from the testimony (testimony of Jacobsen, a deckhand, at page 39 S.M.):

"Q. And what did you see and what did you hear and what happened at that time? A. When this tug and I could not see which one it was when he came through the bridge—but he kept heading right for us."

(Minutes page 56) "The Court: How far was the Pejepscot from the McAllister at the time that you state you observed her coming straight for you?

"The witness: The minute that he came through the bridge he headed right for us.

"The Court: And how far was that then?

"The Witness: About 1,700 to 1,800 feet from the bridge to where we were.

"By Mr. Hanan: Q. And you watched her closing up this distance of 1,700 or 1,800 feet and she was headed directly for the McAllister tug, is that right? A. Yes.

"Q. Then I believe you stated that you observed her direct her course to the left, shortly before the collision? A. She was almost on top of us when she put the wheel over.

"Q. When you say the Pejepscot put her wheel to the left and go to her left, how far away from the stern of the Catherine McAllister tug was she then? A. If she was 15 feet I will say that is the most. If she had put it before she would never have come in contact with us.

"Q. You were in the pilot house you say with Captain Wilson? A. I was.

"Q. Who else was there? A. The other deckhand.

"Q. And were the three of you watching the Pejepscot? A. We were.

"Q. The three of you stood there watching the Pejepscot heading right for the McAllister? A. Yes.

"Q. And you were watching her and you could tell that she was going at a pretty good rate of speed, could you not? A. Yes."

Torris Jermansen, a deckhand on the Catherine McAllister, corroborated this testimony (at page 88):

"Q. Did you see the Pejepscot come through the draw? A. I did.

"Q. What did you observe about the Pejepscot? A. Well, actually she was coming straight across and I thought she was going straight for us.

"Q. Just tell us what you saw her do? A. She came through the west draw.

"Q. And then what? A. She headed right for the Catherine McAllister.

"Q. Did you see her change her course at any time? A. I did not, until after it hit.

"Q. You kept looking at her all the time? A. I did.

"Q. So that from the time you first saw the Pejepscot leave the draw and up until the time that she hit the Catherine McAllister she did not change her course one way or the other. A. That is right."

The captain of the Pejepscot and the other witnesses called on her behalf admitted that she came through the draw at full speed, and headed north up the channel, but the captain testified that his course would have taken her 50 to 75 feet from the stern of the Catherine McAllister if she had remained where she was when he first observed her. Further, their testimony is that when the Pejepscot got fairly close to the Catherine McAllister the latter started to "go astern" without giving a warning

signal of any kind, and the Pejepscot then went to her left, as far as she could without colliding with the other southbound vessels, and blew the danger signal, which consists of four or more short blasts but the Catherine McAllister continued to go astern until she collided with the Pejepscot.

In my opinion those who were in charge of the navigation of the Pejepscot were guilty of negligence. She was being operated at full speed on a dark, windy, rainy night up a channel, the easterly side of which was being blocked by a tug and tow which was athwart it. She saw the other southbound vessels; nevertheless, her captain did not reduce her speed, but continued on a course which would take him, according to his own version, only 50 or 75 feet from the Catherine McAllister's stern, a distance which, under the existing conditions, was too close for safe navigation.

But what did those in charge of the Catherine McAllister do in this situation? Their testimony is that they observed the Pejepscot coming at them at full speed for a distance of 1,700 or 1,800 feet on a course which they believed was sure to result in a collision, and yet they took no steps whatever to avoid it. They sounded no signals, nor did they do anything to indicate their apprehension of the existing danger. All they did, apparently, was to hope that the Pejepscot would change her course before she struck, and even when they observed that she did not intend to change her course, they did nothing. The testimony of Jacobsen, at pages 57–60, S.M., which need not be here repeated, amply justifies such conclusions. The engineer of the Catherine McAllister testified that she was going forward on slow speed. However, he stated also that while waiting for the bridge to open "we just were keeping her in shape, What I mean by that it we would kick it ahead for ten seconds or so *and then go back for 10 or 15 seconds, just to keep the barge in shape.*" (S.M. on page 34, emphasis added.) Thus, while she waited, there was a forward and backward movement.

In view of the foregoing I find both vessels at fault. Submit proposed findings of fact, conclusions of law and decree in conformity herewith.